**PRENTICE, In re Charges preferred against.**

Ohio Appeals, Second District, Franklin County.

No. 4956.  Decided December 18, 1953.

W. B. McLeskey and Claude W. McLeskey, Columbus. for appellant.
Florence G. Denton, Columbus, Frank J. Collopy, Columbus, and James H. Rownd, Columbus, for appellee.

(NICHOLS, J, of the Seventh District, PUTNAM, PJ, and MONTGOMERY, J, of the Fifth District, sitting by designation.)

338

## OPINION

By PUTNAM, PJ.

This is an appeal upon questions of law from an order of the Common Pleas Court of Franklin County, Ohio, whereby said Court en bloc, with the exception of Judge Rose, and composed of the other six judges of the Common Pleas Court of Franklin County, adjudged that Mary Elizabeth Prentice be removed from said office as attorney and counselor at law of this Court, and all the courts of the State of Ohio, and that she stand disbarred.

The charges upon which Prentice was tried are as follows:

"CHARGE NO. 1. It is hereby charged that Mary Elizabeth Prentice has committed acts of misconduct in office involving moral turpitude as an attorney at law.

"CHARGE NO. 2. It is hereby charged that Mary Elizabeth Prentice has performed acts amounting to unprofessional conduct in office involving moral turpitude as an attorney at law.

"The particular specifications of said charges and each of them are as follows:

"1. On or about October 31, 1952, the said Mary Elizabeth Prentice, while representing herself to be counsel for James P. Martin, prepared a written declaration, a copy of which is hereto attached and identified as Exhibit 'A.' Said declaration purports to be an affidavit signed by James P. Martin, sworn to and subscribed in the presence of Mary E. Prentice, a Notary Public, but in truth the said James P. Martin did not swear to the facts in said declaration nor subscribe the signature at the end thereof. The name of James P. Martin was subscribed to said declaration by Mary Elizabeth Prentice. The jurat following the declaration was fabricated by the said Mary Elizabeth Prentice and was known to her when so made to be false and untrue and in violation of §131-1 GC.

"2. Said declaration, a copy of which is hereto attached and identified as Exhibit 'A', purporting to be the affidavit of James P. Martin, was filed by Mary Elizabeth Prentice with the Clerk of the Common Pleas Court of Franklin County, Ohio, in support of a motion in the case of Martin v. Martin, No. 65373, now pending in the Court of Common Pleas, Franklin County, Ohio, Division of Domestic Relations, at which time she represented herself to be counsel for the said James P. Martin. At the time said declaration was filed, said Mary Elizabeth Prentice knew that the jurat following said declaration was false and a fabrication in that the said James P. Martin did not swear or subscribe to said declaration as stated in the jurat.

"3. On or about October 31, 1952, the said Mary Elizabeth Prentice, while representing herself to be counsel for James P. Martin, prepared a written declaration, a copy of which is hereto attached and identified as Exhibit 'B.' Said declaration purports to be an affidavit signed by James P. Martin, sworn to and subscribed in the presence of Mary E. Prentice, a Notary Public, but in truth the said James P. Martin did not swear to the facts in said declaration nor subscribe the signature at the end thereof. The name of James P. Martin was subscribed to said declaration by Mary Elizabeth Prentice. The jurat following the declaration was fabricated by the said Mary Elizabeth Prentice and was known

to her when so made to be false and untrue and in violation of §131-1 GC.

"4. Said declaration, a copy of which is hereto attached and identified as Exhibit 'B', purporting to be the affidavit of James P. Martin, was filed by Mary Elizabeth Prentice with the Clerk of the Common Pleas Court of Franklin County, Ohio, in support of a motion in the case of Martin v. Martin, No. 65373, now pending in the Common Pleas Court of Franklin County, Ohio, Division of Domestic Relations, at which time she represented herself to be counsel for the said James P. Martin. At the time said declaration was filed said Mary Elizabeth Prentice knew that the jurat following said declaration was false and a fabrication in that the said James P. Martin did not swear or subscribe to said declaration as stated in the jurat.

"CHARGE NO. 3. Said declaration, a copy of which is hereto attached and identified as Exhibit 'A', and said declaration, a copy of which is hereto attached and identified as Exhibit 'B', each state that said James P. Martin was cautioned and sworn by the said Mary E. Prentice, which statement is untrue and was known by the said Mary Elizabeth Prentice to be false and untrue when said documents were prepared and when they were filed with the Clerk of the Common Pleas Court of Franklin County, Ohio.

"The acts of the said Mary Elizabeth Prentice herein set forth were committed knowingly and deliberately and for the purpose of deceiving and misleading the Court and to perpetrate a fraud on said Court. Said acts were committed while acting as counsel in a cause pending in the Common Pleas Court of Franklin County, Ohio, and as such constitute misconduct in office and unprofessional conduct involving moral turpitude. Said acts are further a violation of the canons of ethics of the American Bar Association and the oath administered to her upon her entrance to the practice of law."

After a hearing before this Court in which the committee introduced Exhibits A-1 to 45, inclusive, together with a stipulation that Prentice did sign and take the acknowledgement of Martin to the two affidavits in question and that he was not present at the time, the committee rested. The stipulation, however, did not include the admission that Prentice did not have the consent of Martin to sign the affidavit. The exhibits did include an affidavit by Martin that she did not have his consent to sign the affidavits. Thereafter Prentice introduced testimony as to the circumstances of the case and which consumed some two hundred pages of record as to why she was under the circumstances in her own opinion justified in doing what she did do. At the conclusion of the testimony the Court made the following findings of fact and conclusions of law:

### "Findings of Fact

"1. Two typewritten instruments, each purporting to be an 'affidavit,' were filed by Mary Elizabeth Prentice, in her capacity as an attorney at law, with the Clerk of the Division of Domestic Relations of the Common Pleas Court of Franklin County, Ohio, on October 31, 1952, in case No. 65373, upon the dockets of said court, wherein Marilyn Martin was plaintiff and James P. Martin was defendant and in which case said court then had continuing jurisdiction insofar as the custody of the parties' minor child was concerned.

"2. Said Mary Elizabeth Prentice had knowingly and deliberately certified, as a notary public, to said purported affidavits, and each of them, that said James P. Martin had sworn to them and subscribed them in her presence when in fact she had not administered an oath or affirmation to him as to either of said instruments, and she had herself signed the name of James P. Martin to each of said instruments.

"3. Further, when said Mary E. Prentice, as an attorney at law, filed said instruments (mentioned in paragraphs 1 and 2 of these 'Findings of Fact') with said Clerk on October 31, 1952, she well knew that the jurats of each of said instruments were false.

"4. Said instruments, purporting to be 'affidavits,' were each filed by said Mary Elizabeth Prentice for the purpose of supporting a 'Restraining Order' as to the custody of said minor child, which 'order' was procured by her from Judge Clayton W. Rose on said date (October 31, 1952) in Cause No. 65373, upon the dockets of said court, and also supporting a motion filed by her for change of custody of said minor child in said case.

"5. Said filing of said purported affidavits was intended by said Mary E. Prentice, in her capacity as an attorney at law, to support said 'Restraining Order' which recited, among other things, that the motion therefor was 'based upon the affidavit of the defendant (said James P. Martin) contained herein and positively verified * * *', which statement was false and known by said Mary Elizabeth Prentice to be false.

"6. Said acts of filing said false 'affidavits' were performed by the same Mary Elizabeth Prentice, in her capacity as an attorney at law, wilfully and knowingly, for the purpose of deceiving and misleading said Judge Clayton W. Rose, and did constitute an attempt to and. did perpetrate a fraud on said Judge and the Court of Common Pleas of Franklin County, Ohio, of which court he was then a judge.

"Conclusions of Law

"The facts found by this court (as recited in 'The Findings of Fact') were committed by said Mary Elizabeth Prentice knowingly and deliberately and for the purpose of deceiving and misleading said Clayton W. Rose of the Court of Common Pleas of Franklin County, Ohio, Division of Domestic Relations and to perpetrate a fraud on said judge and said court, and each constitutes misconduct in office involving moral turpitude and unprofessional conduct in office involving moral turpitude."

A motion for a new trial was made, based upon 29 grounds, and overruled. Upon further application that entry was vacated and a hearing was had upon the motion for. a new trial in which evidence was introduced on behalf of Prentice by witnesses Carmichael and Huddle and on behalf of the committee by James P. and Marilyn Martin. This consumed another hundred pages of record. Thereafter the motion for a new trial was overruled and judgment entered.

Since the decision of the trial court is based upon acts alleged to have involved moral turpitude and the degree thereof, we deem it necessary to set forth as briefly as possible what we consider the essential facts of the record together with our comments thereon.

The assignments of error in this Court are 29 in number and practically the same as were set forth on the motion for a new trial. They

will not be herein set forth in detail but will become apparent from the statements hereinafter made.

The record shows the following situation: Prentice had been the attorney for Paul and Edytha Webster, husband and wife, for some years. Paul Webster had a daughter, Marilyn, by a former marriage, who in October, 1952, was just over 21 years of age. While a minor, she being then 18 or 19 years of age, on May 13th, 1950, entered into a shotgun marriage with one James P. Martin, an ex-service man who was drawing government compensation for partial physical and mental disability. In August, 1951, the Websters brought Marilyn, who was then a minor, to see Prentice about securing a divorce from her husband James Martin. A petition thereupon was filed by Prentice through Paul Webster as next friend which became cause No. 65373 in the Court of Common Pleas of Franklin County, Ohio, Division of Domestic Relations, Judge Rose presiding. The petition alleged in substance that the defendant, James P. Martin, had failed to provide a proper home or support for the plaintiff, Marilyn; that he had a vile and ungovernable temper and had on several occasions struck the baby then only eight months old Shortly after service of summons on Martin, a separation agreement was entered into between the parties which provided in part that the father should pay $15.00 per week for the support of the child until the child was 21 years old; the mother was given exclusive custody of the child but it was agreed that in the event of her death the custody was to be in the grandparents, the Websters. Prentice and the Websters were witnesses to this agreement, but it does not appear that James P. Martin was represented by counsel. In December, 1951, a divorce was granted to the mother, the separation agreement was approved and made a part of the decree.

The child had been with the Websters practically all the time since its birth and Marilyn had been living with them and working. Very shortly after the divorce, if not before, Marilyn began running around and leading a wild life, keeping company with various men and under such circumstances as to cause the Websters grave concern as to a possible repetition of her former follies and the consequences thereof. The situation became such that about Easter time, 1952, the Websters called Prentice to come out to their home and talk to Marilyn about her conduct and to see if she could not persuade Marilyn to change her habits and attitude. Prentice did this and for a time thereafter Marilyn seemed to have a changed attitude.

However, this did not last long and she resumed her pursuit of pleasure, the Websters in the meantime having the chief responsibility of the baby and all that it entails, including feeding, washing, diaper changes. and the supervision of a boy one to two years old. During this time Marilyn was having much trouble collecting from the father on the support money which he had agreed to pay. James Martin was constantly changing jobs. There is undisputed evidence in the record that from the time of his marriage until January, 1953, he had somewhere between 20 and 35 different jobs; and that he made up to $65.00 per week. That a number of these jobs consisted of bellhop at various hotels.

During the summer of 1952 the evidence is uncontradicted that Mar-

ilyn was not only running around promiscuously with other men but that she went out with her former husband James on numerous occasions and had intimate relations with him. The record is silent as to any motive for this but we can speculate with some certainty that it was either a desire on her part and his to resolve, with a different objective of course, in each case, the question of the support money payments which had not been forthcoming; or just plain sex hypertension on the part of either or both.

In the meantime James Martin himself was pursuing the fleshpots of an industrial society where women were working in factories and offices exposed to the temptations of independent income and relaxed home responsibilities. The record shows that about September 1, 1952, James Martin had started going steadily with one Katherine Carmichael, a married woman with one child, who was then seeking a divorce in the same court. The situation between these two progressed during September and October to a point where marriage was discussed pending the outcome of her divorce and the custody of her child and the custody of his child.

Also, during the late summer Marilyn had taken up with a soldier at Lockbourne Air Base and they were contemplating marriage. In view of this situation Marilyn had contacted James Martin to see if he would consent to the adoption of their child by her contemplated soldier husband if they were married and James gave a partial and qualified consent thereto. The exact sequence of events is not definite. It must have been in late July or early August, 1952, when Marilyn informed her parents that she was going with her soldier friend to St. Louis and wanted to take the baby with them. They strenuously objected to the trip but Marilyn and her soldier boy friend, instead of going to St. Louis, went to Springfield, Ohio, and stayed over the week end in a hotel as man and wife, leaving the baby with the Websters. It was immediately after this that the Websters and Martin became concerned about the future of the baby because the soldier upon his return to Columbus from Springfield was arrested for forgery in the cashing of bad checks and was placed in jail. His Commanding Officer at the Air Base gave him a bad reputation and at this time Martin evidently had a change of heart, as he was wont to do, and stated that he did not want his child raised by a "jailbird". Evidently the situation was discussed by the Websters, Marilyn, Prentice and James Martin. Marilyn asserting that she was going to stick to the soldier and marry him and that she wanted the child. The Websters and Martin were insisting that the child remain with the Websters. It was about this time, and the time is not certain, but surely in early October at the latest, that Marilyn employed Don Hamilton, Jr., as her attorney, because of these divergent views.

In any event, as the situation developed, sometime prior to October 20, 1952, after Marilyn had called Martin at his place of employment from her attorney's office, which must have been Hamilton's office, requesting him to come down to discuss the matter which he refused to do, it was decided by the Websters and Martin, after having consulted with Prentice, that the Websters should file an application in the Probate Court of Franklin County seeking an adoption of the child by the

Websters. On October 20th this application was filed in the Probate Court and James Martin was there and gave his consent to this adoption by the Websters. At the same time, October 20th, the Websters filed a complaint in the Juvenile Court against their daughter Marilyn for contributing to the delinquency of her child. This hearing was set for the next day, October 21st, but since no service was had on Marilyn the hearing was continued until October 30th. On that date a hearing was had before Miss Taylor, a referee, on the affidavit of the Websters. It was supported by other testimony. Marilyn was there and was represented by attorney, Don Hamilton, Jr., and she was cross-examined. She admitted her trip with the soldier to Springfield and her intention to marry him. James Martin was also there of his own volition to testify against Marilyn in support of the things contained in the Webster affidavit and their own testimony. The great weight of the evidence, supported by the testimony of witness Huddle, is that prior to the hearing Prentice went over this testimony with Martin in the witness room and that she heard the same. It is conclusive in our mind that at this time Prentice represented not only the Websters but also Martin. As it happened the hearing was terminated before Martin was called to testify, and the hearing was terminated upon this particular note. The referee announced in effect that the child was not delinquent because the Websters were properly taking care of him and that a charge against Marilyn for contributing to a delinquency which did not exist could not be sustained. The referee, however, did express the opinion that under the circumstances a motion for a change of custody from Marilyn to the grandparents would be in order. This provoked a discussion as to whether or not under the circumstances the Websters were a proper party to make such a motion or whether it should be made by James Martin. We think the evidence is clear that this situation was discussed by Prentice at that time with not only the Websters but with Martin. At this time attorney Hamilton was insisting that the child be immediately turned over to Marilyn, who was under the order of court its custodian. The question then from the standpoint of the Websters and Martin, who were at this time in a position of joint interest, was what was the best thing to do? It was Prentice's position that due to a possible defect of parties that a new application for change of custody should be made and that Martin instead of the Websters should file the motion. The Websters then went home, and Prentice took Martin back to his place of work in her machine in which her mother was a passenger. The evidence is in conflict between Prentice and her mother on one side and Martin on the other as to the conversation on this trip. Prentice testifies that at that time Martin specifically gave her authority to file the affidavits the next day. Martin denies this. Bearing in mind that the discussion did involve previous to this the possibility of Hamilton as attorney for Marilyn, filing a writ of habeas corpus to get the child immediately and the fact which we believe to be true that Prentice had previously instructed the Websters after the hearing, that to obviate this they should secrete the child that evening so that no change of custody could be effectuated, it is only natural that this situation should have been discussed by Prentice and Martin on this trip back

to his place of work. This conclusion is fortified by the overwhelming weight of the evidence that two days afterwards on Sunday, November 1st, Martin went to the Webster home, to visit his child and saw the restraining order and stated that it was in accordance with his instructions to Prentice.

It is a fact that on the night of October 30th, in order to circumvent a change of custody and in order to get a proper restraining order due to the conversations theretofore having taken place or alleged to have taken place, Prentice did herself type out at her own home two motions, (1) by James Martin for a change of custody of the child; (2) by James Martin for a restraining order preventing an immediate change of custody from the Websters; (3) an affidavit by Mr. and Mrs. Webster supporting both motions, and (4) and (5) two affidavits by James Martin supporting both motions. Early the next morning she took the Webster affidavits to their home and caused the same to be signed. No question is raised about the authenticity of these affidavits. Prentice caused a telephone call to be placed to James Martin in what she claims was in accordance with her conversation of the night before with him on the automobile trip, but being at the Courthouse and Martin not being available she filed the two motions and the Webster affidavit and took a journal entry which she herself had prepared for a temporary restraining order to Judge Rose. At that time she discussed the situation with Judge Rose as it had developed the day before with Miss Taylor, the referee, and without presenting any affidavits to Judge Rose, the Judge signed the restraining order, Exhibit No. 25, which recites:

"This cause came on to be heard upon the motion of the defendant for an order enjoining the plaintiff, based upon the affidavit of the defendant contained herein and positively verified * * *."

Thereafter about one and one-half hours and at eleven A. M. Prentice took Martin's affidavit out to his place of work to have him sign the same but he was not there. She returned to the Courthouse, signed his name to the affidavits, affixed her jurat to the same as a Notary Public and filed the same. She then got a certified copy of the entry, took it out to the Websters and left it with them and then presumably the child was returned to the Webster home as being safe from a raid by the mother.

The whole situation certainly points out most strongly to the fact that Prentice and the Websters and Martin were trying to circumvent Hamilton, attorney for Marilyn, in his attempt to get possession of the child by a writ of habeas corpus. This they succeeded in doing at that time and by the procedure herein related. We have no doubt that at this time James P. Martin was not only pleased but elated that this objective was obtained.

After this Sunday, November 1st, a blackout occurred in the record as to what happened between that time and November 6th. We do know, however, that on November 6th, 1952, Martin and his ex-wife Marilyn went to Richmond, Indiana, and were remarried. The objective of this remarriage is a matter of speculation for the most part but if we believe any of the evidence of Carmichael, there was an ulterior motive therein. It is at this time on November 6th and thereafter

that James P. Martin has another change of heart and takes a position exactly opposite to what his position had previously been. Just when the Websters and Prentice became aware of this remarriage is not certain. We must evaluate the testimony of Kitty Carmichael. In so doing we must keep in mind the possibility that a woman scorned is dangerous and that the female of the species is more dangerous than the male. Yet we do believe her testimony under all the circumstances of this case to be that Martin simply remarried his former wife in order to get him out of a situation which he could not and did not want to fulfill. She states very definitely that Martin told her that the remarriage between him and his wife was only for the purpose of gaining custody of the child. This issue does give this Court some concern and we are not inclined in the face of the foregoing observations to discount her testimony.

Now, thereafter, and mark it well, this is what happened. After this second marriage became known to the Websters, and this was prior to November 13th, 1952, the problem arose as to what should be done as to this child. Martin as an ally to the Websters was out because he was already remarried to Marilyn and on her side. The Websters wanted the child, they did not want to have the child in the custody of Marilyn under the then situation. The Websters were relying on Prentice, their old attorney, to get them out of this mess. Consequently, on November 13th, 1952, they filed new affidavits in the same court requesting that they have continued jurisdiction of this child until a final hearing, and this motion was based upon affidavits which contained the same statement of facts, or approximately so, which were filed prior to the hearing on October 30th. Upon this affidavit, and it was before the original Judge, Judge Rose, and upon hearing in which Marilyn was represented by Attorney Hamilton, the custody of this child was ordered retained by the Websters. Later, on November 17th, this order upon motion by Hamilton, attorney for Marilyn, was modified to allow James and Marilyn, they then being married, custody of the child on Sundays, and a final hearing was set at a later date.

Now with this background in mind, remembering that the application for adoption of this child was still pending in the Probate Court of Franklin County, and with the consent of James Martin, and that Attorney Hamilton then representing Marilyn and James Martin had lost two preliminary skirmishes before Judge Rose, who had ruled on November 13th and upon November 17th **upon the Webster affidavits alone,** that a change of custody was not warranted so as to give the daughter Marilyn the custody of the child, we are faced with the proposition as to why the future events occurred. Certainly on November 13th and November 17th, 1952, Judge Rose was motivated by and only by the affidavits which the Websters had filed and the testimony and the facts thereupon proven which indicated that a change of custody to Marilyn Martin was not warranted.

Faced with this situation what then happened? On November 24th James Martin, under the suggestion and at the instigation of Attorney Hamilton, executed an affidavit that Attorney Prentice was not authorized by him to execute the affidavits in question of October 31st,

nor did he acknowledge the same before her. These affidavits were retained in Attorney Hamilton's office until December 1st when they were transmitted to Judge Rose with a request that they be referred to proper authorities, suggesting that proper authority would be the Grievance Committee of the Franklin County Bar. Thereupon on the same date, December 1st, Judge Rose transmitted the same to the Presiding Judge of the Court of Common Pleas of Franklin County, Ohio, with a request that proper action be taken as determined by the Court. Nothing else appears upon the record until January 16th at 2:08 P. M., when an entry was filed by the Common Pleas Court appointing a Grievance Committee and at the same hour and minute on the same date the Grievance Committee filed the charges herein. It is to be observed, however, that the charges filed by the Grievance Committee were sworn to by that committee on December 15th, 1952. We are not convinced that this discrepancy shows any irregularity, but at least it is a circumstance which we cannot ignore. It is further to be observed that in December a motion was filed by Hamilton on the account of Marilyn to dismiss all proceedings as related to the custody of the child because the parties were then remarried and because the affidavit upon which a motion for change of custody was predicated was based upon James P. Martin's affidavit which was not authorized.

We must keep in mind at this particular stage of the proceedings the heated contest for the custody of this child had become somewhat bitter between Prentice and Hamilton. In fact the situation was such that at a date shortly prior to December 1st and probably due to a conversation which she had had with Hamilton before Judge Rose, and in which he had accused her of filing a false affidavit about October 30th, and which came up incidentally at their meeting in Judge Rose's office, Prentice had filed an affidavit of prejudice against Judge Rose. This accusation was heard by the Chief Justice of the Supreme Court and the same was overruled on December 5, 1952.

The trial upon the charges preferred by the committee appointed by the Court started March 17, 1953, Judge Rose not participating therein. The entry of disbarment made by the Court hearing the charges was made a final order after the full hearing upon the motion for a new trial. And this law appeal results.

As previously stated, there are 29 assignments of error, which are practically the same as those contained in the motion for a new trial and which will be discussed generally without repeating them specifically as we deem them important and as applying to our conclusions in this case.

In the first place it is to be noted that the findings of fact do not embrace any findings (1) that Prentice was guilty of unethical misconduct in representing divergent interests in the litigation under scrutiny herein. It was not charged and it certainly was not proven. (2) There was no finding that Prentice was not authorized by Martin to sign his name to the affidavits in question. This was not charged nor was it proven. Consequently, it is clear that the sole basic facts on which the charges were sustained are (1) that Prentice took and certified the jurat to these two affidavits without actually swearing Martin thereto.

This fact is not disputed but it is admitted by Prentice. (2) That this was done for the purpose of and did work a fraud upon the Court. This is denied and not admitted.

Under the evidence herein we are constrained to hold that these facts are true but true only in a technical sense; and this in the sense that the entry which Prentice presented to the Court recited that the same was granted solely upon the sworn testimony of Martin. It is not true in the sense that the facts therein contained and which would motivate a court to act were untrue. As hereinbefore pointed out, Judge Rose did later grant another restraining order upon practically the same facts as sworn to by the Websters in their affidavit of October 30th and which was repeated in their affidavit of November 13th. This shows that the Martin affidavit of October 30th was not an actual but only a constructive fraud upon the Court. It also shows that Prentice's concern about the defect of parties and the necessity of James Martin himself making an affidavit for a restraining order were not well founded in law, otherwise, Judge Rose would not have later issued a restraining order upon the affidavit of the Websters alone in this the same case.

While this Court does not condone this action on the part of Prentice, certainly the facts show extenuating circumstances. These have already been recited. She was trying to beat Hamilton to the punch. Hamilton was trying to get the child away from the Websters and to Marilyn due to the previous order which was granted under conditions not then existing. It was a race to see who would get the custody. All of these facts must be considered in determining whether moral turpitude is involved in the acts and if so, the degree thereof.

We desire to make one additional observation, viz: The practice of courts in signing entries based upon affidavits not presented to the court with the entry is not to be commended. This practice furnishes the opportunity and the temptation for short cuts and confused statements such as are herein shown and also a misunderstanding between the attorney and the court as to the actual contents of those affidavits as recited by the attorney to the court. Certainly that recital could give rise to many questions of fact as to what was actually said in that recital and which would not be conducive to the best administration of justice. The argument that the practice is necessary due to the press of business is cogent but it is not sufficient to overcome other reasons for the discontinuation of that practice.

Now going to the assignments of error generally and not specifically, it is contended that the term "moral turpitude" as contained in §1707 GC, is so vague and indefinite as to amount to a denial of "due process of law" under constitutional restrictions. It is further contended under this assignment that if the above proposition is not true that the acts specifically charged in this case do not constitute conduct involving moral turpitude.

Sec. 1707 GC, provides as follows:

"The Supreme Court, Court of Appeals or Court of Common Pleas my suspend or remove an attorney at law (from office) or may give private or public reprimand to him as the nature of the offense may warrant, for misconduct or unprofessional conduct in office involving

moral turpitude, or for conviction of a crime involving moral turpitude."

**Sec. 1708 GC,** provides as follows:

"Before an attorney is suspended or removed, or publicly or privately reprimanded, written charges must be filed against him, stating distinctly the grounds of complaint, and a copy thereof, certified by the clerk, under the seal of the court, served upon him."

As to the first contention, suffice it to say that this proposition in our judgment is not tenable. The overwhelming weight of authority is to the contrary. The second proposition warrants some examination. Specifications numbers 1 and 3 definitely charge that the falsifications of these jurats were in violation of §131-1 GC, of Ohio, which provides:

"Whoever being a notary public certifies to the affidavit of a person without administering the oath or affirmation to such person is guilty of a misdemeanor and shall be fined not more than one hundred dollars or imprisoned not more than thirty days, or both, and removed from office by the court of common pleas of the county in which the conviction was had.' The court shall thereupon certify such removal to the governor. The person so removed shall be ineligible to reappointment for a period of three years."

Under the undisputed evidence Prentice was found guilty of a violation of this Section although she was never convicted thereunder. One of the vital questions is: Did this act involve moral turpitude in any degree? In the case of **In re Jacoby, 74 Oh Ap 147,** which was a disbarment proceeding but upon different grounds, the writer of this opinion representing a Court of Appeals, and incidentally said Court was composed of the same judges who are now hearing this case, said at page 154 of that opinion as follows:

"Moral turpitude is a term which has been much defined by the courts. In some respects this term is like the term 'reasonable doubt'. Its definition does not gain in clarity by prolixity of statement.

"In 'Words and Phrases,' twelve pages are given to various definitions by different courts and to the statement of what crimes do and do not involve moral turpitude. Probably the simplest definition is that moral turpitude is anything done contrary to justice, honesty, principle or good morals. It is also defined as an act of baseness, vileness or depravity in the private or social duties which a man owes to his fellow men or to society in general contrary to accepted and customary rules of right and duties between man and man. It is also generally accepted that the norm of conduct by which an act is judged to determine whether it involves moral turpitude is a standard prevailing in the United States and at the present time." * * * "The severity of punishment imposed is not controlling on the issue whether the offense involves moral turpitude. Offenses or crimes in Ohio are classified as being either felonies or misdemeanors. Felonies are those punished by death or imprisonment in the penitentiary. All others are misdemeanors and yet it is generally recognized that misdemeanors may involve moral turpitude."

In view of the above considerations it is our judgment that the acts charged did involve moral turpitude but that the degree thereof was not grave.

We do not find that the trial court abused its discretion in not re-

ferring the charges to a grievance committee of the Columbus Bar Association as was theretofore the custom. The statute does not so limit its action and we are not disposed to do so. As above pointed out, however, the fact that the appointment of a grievance committee only became apparent by entry on January 16th, 1953, at which time the charges were also filed, which had theretofore been certified by the committee on December 15th, 1952. These facts no doubt had some influence upon the state of mind of defense counsel in pressing that allegation of error.

We do not, however, find that the trial court was prejudiced by the admission of evidence as to facts not contained in the charges and specifications which concerned the authorization of Prentice by Martin to sign the affidavits; nor as to certain communications alleged to have been communicated to the court during the trial as to other activities of Prentice not contained in the charges. The Court stated from the Bench that it would disregard all these matters. This frequently happens in trial and in reviewing courts in hearing matters in the absence of a jury where the question as to the admissibility of evidence is reserved for future determination and we consider that the trial court on this occasion did so do. The findings of fact which they made, and the ones they did not make, would indicate that they did this very thing. We do not think that the appellant's argument that finding of fact No. 6 and the Court's conclusion of law from all of the finding of facts, indicate to the contrary, is sound.

It is the appellant's contention that the conclusion of law by the Court from its finding of facts, and its judgment based thereon, could only be reached through passion and prejudice and a consideration of extraneous circumstances and rumors and could not come from the evidence at hand. We cannot concur in this viewpoint. The conclusion of the Court could have been made through a misapprehension of law and an abuse of discretion which was not based upon passion and prejudice.

This Court, however, does find that assignment of error No. 23 is well taken with the exception of that part thereof which states that the judgment was the result of passion and prejudice. This assignment is as follows:

"That the judgment of said court, to wit: that the said Mary Elizabeth Prentice 'hereby is removed from said office as attorney and counselor at law of this Court, and all of the courts of the State of Ohio, and that she stand disbarred', is excessive and unreasonable, is not justified by the evidence, is the result of passion and prejudice and constitutes an abuse of discretion on the part of said Court."

In our opinion this judgment is excessive and unwarranted by the facts in this case. Life disbarment of an attorney for failure to administer a formal oath in the jurat of a legal paper where the fraud upon the Court was only constructive and not actual and was slight, as in this case, is shocking to the conscience of two members of this reviewing court and in the opinion of Judge Montgomery it is excessive under the charges herein preferred.

However, having found that the act was misconduct in office and unprofessional conduct in office as an attorney involving moral turpitude

350

and that that finding was justified under the evidence, we are constrained not to reverse the case but to modify the judgment of the trial court which is our privilege and prerogative under the statute. Inasmuch as §131-1 GC, provides that a notary shall be ineligible for reappointment for a term of three years for a violation of this section, and admittedly Prentice did violate the section, it is our conclusion that she being an attorney should have a somewhat more severe penalty imposed. Consequently, it is our judgment that the judgment of the trial court be modified as follows: That said appellant stand suspended from the office of attorney at law in all of the state courts of the State of Ohio for a period of four years. It is so ordered.

NICHOLS and MONTGOMERY, JJ, concur.